Filed 9/16/20  Conservatorship and Estate of Adams CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of NILA B. ADAMS.<br><br>RICHARD E. ADAMS,<br><br>    Petitioner and Respondent,<br><br>      v.<br><br>ANNETTE RAATZ, as Conservator, etc.,<br><br>    Objector and Appellant. | G058417<br><br>(Super. Ct. No. 30-2016-00828829)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Edward W. Hall, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed.

        Messina & Hankin and Theodore M. Hankin for Petitioner and Respondent.

        Murtaugh Treglia Stern & Deily, Devin Murtaugh and Thomas N. Fay for Objector and Appellant.

In this trust dispute, the trial court determined a written document prepared by Richard Adams and signed by his mother, Nila Adams, constituted an amendment to Nila's trust.[1] Nila's daughter, Annette Raatz, contends the document was not an amendment, but merely a memorandum (memo) containing a list of 16 different topics for consideration between Nila and her attorney. We agree with Annette and reverse the court's judgment.

FACTS

Robert F. Adams and Nila, as husband and wife, established the "Robert F. Adams and Nila B. Adams Trust Dated May 6, 1996" (the Trust). They designated their children, Richard and Annette, as successor co-trustees as well as the sole beneficiaries of the Trust. One day later, Robert and Nila executed the first amendment to the Trust. They changed how the Trust would be allocated during the surviving spouse's lifetime, providing that upon the death of the first spouse, the Trust would split into three sub-trusts: the "'Survivor's Trust,'" the "'Marital Deduction Trust,'" and the "'Residual Trust.'"

Pursuant to the first amendment, the surviving spouse retained the power to amend, revoke, or terminate the Survivor's Trust during his or her lifetime. After the death of the surviving spouse, all three trusts would recombine and be distributed to the Trust beneficiaries. The first amendment did not change the successor trustee or beneficiary designations. Just one month later, Robert passed away.

In 2002, Nila amended the Trust, removing Richard as a beneficiary and successor co-trustee, leaving Annette as the sole successor trustee and beneficiary. The amendment listed Richard as successor trustee in the event Annette was unable to serve. In 2003, Nila again amended the Trust, this time removing any mention of Richard and replacing his role as backup successor trustee with Kenneth Raatz.

---

[1] Because all parties besides Annette share the same last name, we refer to them by their first names. We intend no disrespect.

In 2014, after Nila began experiencing cognitive difficulties, Annette brought a petition for conservatorship over her mother. In response, Richard filed his own petition for conservatorship over Nila. The court required the parties to attend a series of settlement conferences to resolve the competing petitions. During the second of these settlement conferences, Nila indicated she wanted her children to share equally in her investments. Nila's court appointed lawyer, Claudette Kunzman, testified she believed Nila to be lucid when she made this statement.

Prior to the official order of conservatorship (but after the parties had agreed on the terms and submitted them to the judge for approval), Richard visited Nila and discussed the distribution of the estate. Richard testified Nila expressed her wishes to reinstate Richard as a beneficiary and divide her assets equally between her two children.

In July 2015, Richard drafted a memo to be signed by Nila and forwarded on to Kunzman. The document was entitled "MEMO" with the subject line reading, "Action Items." It was addressed to Kunzman and identified Nila as the sender. The preface to the memo stated, "[t]he items listed below are for your consideration." The 16 items on the list began with the disputed first item at issue which read, "Trust—Change my trust to the following distribution. 50% to Richard . . . and 50% to Annette . . . . Administrator of Trust: Change from Annette . . . to Richard . . . ." The memo also contained other requests a client would make of their lawyer, including item No. 3, ("Gifts to family") item No. 11 ("Repair estimate on residence to make it rentable"), and item No. 16 ("Sunday Edition of the Orange County Register"). On July 7, 2015, Richard presented Nila with the document. According to Richard, Nila approved and signed the memo, stating it was a "'done deal,'" and Richard subsequently sent the document to Kunzman.

About a week later, Kunzman met with Nila to discuss the proposed changes and confirmed Nila desired her children to receive equal shares of the Trust.

Kunzman then informed Aaron Charles Gregg, Annette's attorney, of Nila's wishes regarding the Trust distributions. Kunzman recommended the successor trustees stay the same, and indicated she would "have to file a petition to accomplish this."[2] Kunzman took no further action to amend the Survivor's Trust and did not file the necessary petition or a substituted judgment.

On August 19, 2015, the terms of the conservatorship were ordered, which included the following: first, Annette would act as her mother's conservator; second, Kunzman would remain Nila's attorney on any further issues surrounding Nila's estate; and third, neither Annette nor Richard could discuss financial matters with Nila. Throughout this period, Richard had weekly visits with his mother, 11 of which Kunzman was present for. Kunzman testified Nila "thoroughly enjoyed the visits by her son."

Nila died on July 18, 2016. About two years later, Richard filed a petition to determine his interest in the Trust property, asserting the signed memo was effective as a fourth amendment to the Trust and he was entitled to a one-half share in the Trust.

At trial in December 2018, Annette moved for a directed verdict on the ground that the memo was not a testamentary document. The court granted her motion, then sua sponte vacated the order as it determined a directed verdict in a non-jury trial was not authorized by statute. The court declined to rule on Annette's motion for judgment under Code of Civil Procedure section 631.8 on the same grounds as the directed verdict. Under that same section, the court allowed Richard to reopen his case and testify again.

After all parties rested for the second time, the trial court found for Richard stating, "The court finds by clear and convincing evidence that Nila was had [*sic*] the capacity to amend the trust in July 2015 and the trust was amended by [the memo] and in

---

[2] Kunzman recommended the successor trustees stay the same. It is unclear from the record if this was her opinion or Nila's wishes.

4

compliance with Probate Code section 1540l[, subdivision](a)(2)." This judgment reallocated half of the Trust estate to Richard and changed the administration of the Trust from Annette to Richard.

DISCUSSION

I. *Standard of Review and Pertinent Law*

Our review is de novo: "The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]" (*Poag v. Winston* (1987) 195 Cal.App.3d 1161, 1173; *see also Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 452-453 (*Wells Fargo*).) As the facts of the case are not in dispute, we review the instrument de novo.

A trust amendment must be made according to the proper procedure. Trusts may be modified by the same procedure as revocation. (Prob. Code, § 15402, all further statutory references are to the Probate Code.) Section 15401 lays out two procedures for revoking a trust: first, "[b]y compliance with any method of revocation provided in the trust instrument." (§ 15401, subd. (a)(1).) Second, if the trust does not make the method of revocation exclusive, "By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation." (§ 15401, subd. (a.)(2).) Thus, "either method may be used [to revoke the trust] unless the trust instrument explicitly makes its method of revocation exclusive. [Citation.]" (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 552.) These principles apply similarly to trust modifications. Section 15402 specifies "[u]nless the trust instrument provides otherwise, [. . .] the settlor may modify the trust by the procedure for revocation."

5

Here, Article X (paragraph B) of the Trust dictates, "On the death of the Deceased Spouse, the Surviving Spouse shall have the power to amend, revoke or terminate the Survivor's Trust, but the Marital Deduction Trust and the Residual Trust may not be amended, revoked or terminated." Further, paragraph B outlines, "[r]evocation and amendment shall be made in the manner provided in paragraphs A and C of this Article X." Paragraph C of Article X concerns the procedure for amendments which is parallel to the requirements of the [P]robate [C]ode. An amendment may be made "by an instrument in writing signed by both Settlors and delivered to the Trustees." Thus, while the document does not explicitly specify, the last section of paragraph B strongly implies when only one Settlor is alive, an amendment is made when the surviving Settlor signs the document and delivers it to the trustee.[3]

We note neither party disputes this document is a written instrument nor do they dispute Nila signed it willingly. With regard to the third requirement, Kunzman delivered the memo to Gregg, Annette's attorney. "It is well established by numerous authorities [. . .] that the knowledge of an attorney is imputed to his clients." (*Laukkare v. Abramson* (1935) 9 Cal.App.2d 447, 449.)

Next, we must also discern the trustor's intent. "The primary duty of a court in construing a trust is to give effect to the settlor's intentions. [Citations.]" (*Barefoot v. Jennings* (2020) 8 Cal.5th 822, 826.) In determining the trustor's intentions, there are several guiding principles. To resolve any ambiguities in the purported intention of the settlor, courts may take into account extrinsic evidence of surrounding circumstances, "although not to give [the settlor's intention] a meaning to which it is not reasonably susceptible. [Citation.]" (*Wells Fargo, supra*, 20 Cal.App.4th at p. 453.)

---

[3] We note the trial court determined the Trust did not outline the procedure for amendment when only one Settlor is alive. Ultimately, this error is not material. Because the Trust and sections 15401 and 15402 lay out identical requirements for an amendment, the ultimate outcome is the same in either circumstance: for an amendment to be operative, it must be in writing, signed by one Settlor, and delivered to the Trustee.

Furthermore, "[t]he intent of the trustors must be ascertained from the whole of the trust instrument, not just from separate parts. [Citation.]" (*California First Bank v. Townsend* (1981) 124 Cal.App.3d 922, 930 (*California First Bank*).) As with all probate cases, "each case depends upon its own peculiar facts." (*Wells Fargo Bank*, *supra,* 20 Cal.App.4th at p. 453.) Determining the trustor's intent cannot be made by solely relying on precedent; instead these cases usually require an independent investigation into the facts. (*Ibid.*)

As for testamentary intent in general: "[I]t must appear that decedent intended to make a testamentary disposition *by that particular paper*, and if this cannot be shown it is immaterial that his [or her] testamentary intentions were [or would have been] in conformity with it. [Citation.]" (*Estate of Wong* (1995) 40 Cal.App.4th 1198, 1205.) The key phrase is the italicized "by that particular paper."

II. *Analysis*

Governed by these rules of interpretation, we determine the trial court erred by allowing the memo to act as the fourth amendment to the Trust. The memo contained a list of action items to be discussed with Kunzman. It was not intended, by itself, to amend the Trust, but was instead drafted in anticipation of a future amendment.

Before moving forward, "[i]t bears emphasis that we are here concerned not with the meaning of the instrument, but with the intention with which it was executed." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95.) To illustrate this difference, *Pena v. Dey* (2019) 39 Cal.App.5th 546 (*Pena*), is instructive. In *Pena*, the decedent annotated his existing trust with his desired changes and attached a signed Post-it® note to the interlineated trust before forwarding the information to his attorney. (*Id.* at p. 550.) He died before the amendment could be drafted and signed. (*Ibid.*) The court held the interlineations did not constitute an amendment because they lacked a signature as procedurally required under section 15401. (*Id.* at p. 554.) More relevant to the present case, however, was the court's determination regarding the signed Post-it® note. In

7

finding the Post-it® note could not be an amendment, the court opined, "[i]f [the decedent] intended the interlineations and signature on the Post-it® note to amend the trust by themselves, there would have been no need to have [his attorney] prepare the amendment for his signature." (*Ibid.*)

Here, like in *Pena*, the issue is not whether Nila desired to amend the trust to enable Richard to receive half of the Survivor's Trust at some future point in time as a result of additional action. Rather, the pertinent issue is whether Nila signed the memo with the belief that it was an amendment of the Trust in and of itself. The evidence does not support the assertion Nila intended the memo alone to effectuate her wishes.

On its face, the memo was a list of various proposed actions for Kunzman's consideration. Indeed, the items ranged from the heavily disputed item, the one at issue here, to the mundane—addressing the "Sunday Edition of the Orange County Register." As stated above, the intent of the trustors must be discerned from the totality of the trust instrument. (*California First Bank, supra,* 124 Cal.App.3d at p. 930.) Accordingly, courts "may also consider the necessary implication arising from the language of the instrument as a whole.' [Citations.]" (*Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1074; *see also* § 21121 ["All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole"].)

The document Richard drafted is entitled "MEMO" in large, bold font with the intended recipient being Kunzman. The subject line states "Action Items." As a precursor to the list, Richard has noted, "The items listed below are for your consideration." The document outwardly conveys no testamentary intent. Instead, it is a list of items Nila requested from Kunzman. The memo is analogous to the Post-it® note in *Pena* and appears to be nothing more than requests from a client to an attorney. Notably, after her discussion with Nila, Kunzman indicated she "would keep the successor trustees the same," departing from the express language of the supposed trust amendment. This is consistent with the view the memo was a list of items to be

8

discussed with Kunzman, rather than a finalized trust amendment. Kunzman also indicated that further action on her part would be necessary to effectuate the change to the trust desired by Nila, again consistent with the interpretation the document was not a finalized trust amendment.

To counter this, Richard argues the memo should be viewed in light of the surrounding circumstances, specifically highlighting Nila's "'done deal'" statement after signing.[4] If we assume Nila was lucid enough to understand the changes she was making to her estate, it follows she was sufficiently lucid to read the document and understand it as a self-identified list of proposed requests to her attorney. It is likely Nila said, "'[i]t's a done deal'" to convey a metaphorical conclusion of the issue, rather than to reflect her belief the memo was an operative amendment. Her statement, even if properly admitted, is not enough to contradict the clear and convincing evidence of the document itself as well as the other existing extrinsic evidence.

Even if we could harmonize Richard's interpretation of the "done deal" statement with the document itself, Nila's past experience and her actions at the time contradict the idea Nila believed the amendment was finalized. Nila amended her trust three times before and was familiar with the process to do so. She made two of these amendments after Robert passed away, further showing she had a basic understanding of the process of amending a trust and had past experience working with an estate planning attorney. This conclusion is also supported by the meeting Kunzman arranged with Nila to discuss the memo. Kunzman testified she met with Nila to discuss Nila's "desire and intent that her children benefit equally from her estate." Nila was said to be lucid and understanding during that meeting. If Nila truly believed the memo finalized the amendment, the meeting with Kunzman would have been redundant because her wishes

---

[4] We believe the trial court erred by admitting this hearsay statement. The parties, however, did not brief this issue. In any event, even if we consider the hearsay statement, it did not demonstrate the requisite testamentary intent.

9

would have already been finalized.  Thus, taking into account both the document itself and Nila's actions and past experience, it is unlikely Nila believed the memo amended the Trust.

Additionally, all testifying parties understood the memo as a list of proposed actions.  Kunzman confirmed she believed the memo was "a list of action items [Nila] was concerned about."  In her confirmation letter to Gregg, she indicated she would have to "file a petition" to accomplish the amendment.  Kunzman was explicit during both her testimony and her letter that at the time she did not view the list as an amendment.

Similarly, Richard did not view the memo as a standalone amendment.  During his testimony, Richard was asked what he expected Kunzman to do with the memo after it was sent to her.  He replied, "I expected her to go to court or whatever was necessary and change the trust."  When he was later asked if he knew if all of the items on the list were carried out, he responded, "That was . . . Kunzman's responsibility."  Both statements show Richard saw the memo as a precursor to an effectuated amendment.  This testimony is also supported by Richard's actions.  If the amendment was self-executing, he would have immediately become the new trustee.  In reviewing the record, there is no instance where he behaved as though he was the new trustee.  He did not contact Annette to inform her of the change, he did not try to obtain the necessary bank information or accountings, and he did not follow up with Kunzman or Gregg about information needed as trustee.  All parties viewed the memo as a list of proposed actions and conducted themselves accordingly.

In his brief, Richard states that Nila's thoughts and intentions regarding the memo are all that ultimately matter.  This presumes the face of the memo indicates it was a trust amendment.  It does not.  The memo, on its face, is a list of topics to be discussed between Nila and Kunzman.  Richard does not contend the other 15 items on the list constituted binding trust amendments, even though item Nos. 2, 3, 7, 8, 11, and 12

10

arguably bear upon trust distributions or administration. In construing a written instrument, whether contract or trust, the intent of the drafter must be "'ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]' [Citation.]" (*Wells Fargo, supra*, 20 Cal.App.4th at p. 453.) Thus, while the trial court focused solely on the language of item No. 1, the context of the entire memo governs, and unambiguously demonstrates this was a list of topics to be discussed between Nila and her attorney Kunzman, not an operative trust amendment.

We stress we are not ruling on whether some evidence showed Nila wanted to amend her trust to allow Richard to share in the estate. We simply disagree she did so with the memo. Procedural requirements for trust documents exist to ensure the wishes of individuals who have taken the time to designate heirs are not changed after death. Trustors sacrifice time and money to ensure they leave an accurate roadmap of their wishes after death, and before everything else, we are concerned with effectuating their last wishes as they intended. To assume intention based upon an ambiguous signed writing that conflicts with the Trust document itself sets a dangerous precedent. Based on the clear language of the memo, Nila's experiences and actions, and the third parties' interpretation of the memo, it was a list of proposed actions that did not constitute an amendment.

## DISPOSITION

The judgment is reversed.  Appellant shall recover her costs on appeal.


O'LEARY, P. J.

WE CONCUR:


IKOLA, J.


GOETHALS, J.