[No. C045728. Third Dist. Oct. 18, 2004.]

Estate of JOSEPH W. GOYETTE, Deceased.
JOANNE RAMOS, as Administrator, etc., Petitioner and Respondent, v.
ELEANOR HARKEY, Objector and Appellant;
VIVIAN YORK et al., Claimants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION‡]**

‡Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part IIC.

## Counsel

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen and C. Athena Roussos for Objector and Appellant.

No appearance for Petitioner and Respondent.

Weintraub Genshlea Chediak Sproul, Kelly E. Sutter, Thomas L. Riordan and Thadd Blizzard for Claimants and Respondents.

## Opinion

**ROBIE, J.**—What does the phrase "my money" mean in a holographic will? Here, we conclude the trial court correctly concluded this term included bank

accounts and certificates of deposit, a money market account, a Fidelity U.S. Government Reserves Fund, United States treasury bills and United States savings bonds. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Joseph Goyette died in 2001. He had no spouse or children when he died. He was survived by his cousins, sisters Joanne Ramos, Eleanor Harkey, and Kathryn Ramey. Over the years, Harkey and her sisters lived next door to Goyette. Harkey lived there until the date of Goyette's death.

Goyette's holographic will states:

"I wish to leave to James Hayward Fifty percent of my money and Fifty percent of my money to my neighbor and friend Vi York.

"I wish to leave James Hayward the lot across the street from my home.

"I wish to leave Vi York my home and the lots around it."

At the time of his death, Goyette's estate (appraised at $742,196.85) was comprised of the following assets:

| | |
|---|---|
| —Retirement savings accounts, checking and savings accounts, and certificates of deposit | $231,480.92 |
| —Money market account | $81,878.64 |
| —Fidelity U.S. Government Reserves Fund | $9,576.14 |
| —United States treasury bills | $304,183.55 |
| —Unites States savings bonds | $25,627.60 |
| —Real property | $78,500.00 |
| —Miscellaneous personal property | $10,950.00 |

The court appointed Goyette's cousin, Joanne Ramos, as the administrator of his estate. In her "First & Final Report of Administration; Petition for Final Distribution; Allowance of Statutory Attorney's and Administrator's Compensation," Ramos sought permission to distribute all of the above assets and the miscellaneous personal property located on the real property to James Hayward and Vivian York.

Subsequently, Ramos filed a petition for instructions from the court as to what assets constituted " 'money'. . . distributable to Vivian York and James Hayward and what assets, if any, are 'residue' distributable to the heirs" under the law of intestacy. Ramos eventually withdrew that initial petition for instructions but later filed a second petition for instructions requesting that the court determine which of Goyette's assets constituted "my money."

York and Hayward argued "my money" meant all of Goyette's wealth. In response, Harkey[1] argued "my money" referred only to "funds {or medium of exchange, i.e. <u>cash or cash equivalents</u>)."

On October 29, 2003, the trial court concluded that the following assets constituted "my money" and were distributable to York and Hayward: (a) the retirement savings accounts; (b) checking and savings accounts; (c) certificates of deposit; (c) the money market account; (d) the Fidelity U.S. Government Reserves Fund; (e) the United States treasury bills; and (f) the United States savings bonds.

## DISCUSSION

### I

### *Standard of Review*

"A will must be construed according to the intention of the testator as expressed therein, and this intention must be given effect if possible. Each case depends on its own particular facts and precedents are of small value." (*Estate of Stadler* (1960) 177 Cal.App.2d 709, 711 [2 Cal.Rptr. 515].) Stated another way, " ' "The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible." ' [Citation.]" (*Estate of Verdisson* (1992) 4 Cal.App.4th 1127, 1135 [6 Cal.Rptr.2d 363].)

Probate Code section 21122 guides the interpretation of wills: "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained. Technical words are not necessary to give effect to a disposition in an instrument. Technical words are to be considered as having been used in their technical sense unless (a) the context clearly

---

[1] Ramos declared a conflict of interest because of her roles as both the administrator of the will and potential recipient of these funds as an heir. As a result, she presented legal authorities, but did not present an argument to the court.

indicates a contrary intention or (b) it satisfactorily appears that the instrument was drawn solely by the transferor and that the transferor was unacquainted with the technical sense."

"In reviewing a trial court's construction of a will, we are free to independently interpret the instrument as a matter of law *unless* the trial court's interpretation turned upon the credibility of extrinsic evidence or required resolution of a conflict in the evidence. [Citations.] 'The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court['s] determination is binding.' [Citation.]" (*Estate of Verdisson, supra*, 4 Cal.App.4th at pp. 1135–1136.)

## II

### *"My Money" Meant Goyette's Financial Assets*

Harkey argues the trial court erred in its ruling because "the term 'money' as used in Goyette's will includes only cash and bank accounts; it does not include investments." We reject this argument.[2]

### A

### *Case Law Concerning "Money" Shows That Term, Standing Alone, Is Ambiguous*

Several California cases have addressed the issue of what a testator means when he or she uses the term "money" in a will.

In *Estate of Stadler,* the testatrix left specific bequests to several beneficiaries and concluded her will with the phrase, "Divide the rest between Hoerners & Chas Fischer (money left over when Settled.[)]" (*Estate of Stadler, supra*, 177 Cal.App.2d at p. 711.) The question was whether the phrase "money left over when Settled" included the testatrix's real property, which was otherwise not mentioned in the will. (*Ibid.*) The court stated, " 'The word "money" used in wills is essentially ambiguous. [Citation.] In a bequest it means money and money only, unless there is in the context of the

---

[2] We are troubled by Harkey's arguments that "money" does not include "*stocks*, bonds, and other investments" or "*stocks* and other securities" or "stocks." Goyette's estate is devoid of any stocks. Thus, we find Harkey's argument that "money" does not include *stocks* is irrelevant.

will something to indicate that the testator intended a more extended meaning. [Citation.] When used in a will it has no fixed or technical meaning, but is a term of flexible scope having either a restricted or a wide meaning according to the signification which the testator intended to give the word, and may be used to mean cash only, personal property, or even wealth—that is, property of any kind that may be converted into cash. [Citations.] Where the context of a will discloses the intent of the testator to attribute to the word "money" a specific meaning which is more comprehensive than the meaning ordinarily given to it, that meaning will be adopted and may comprehend any class of property defined by the context. [Citations.]' " (*Id.* at p. 712.) The court concluded the testatrix used the term "money" in its most flexible sense. (*Id.* at p. 713.) The court concluded that it was doubtful the testator understood the distinction between different types of property and that because she made a will it evidenced her intention not to die intestate. (*Id.* at pp. 712–713.) Further, the fact that the will was silent about bonds and a promissory note she owned was an indication she did not distinguish between "money" and other types of property. (*Id.* at p. 713.)

Similarly, in *Estate of Whitney* (1958) 162 Cal.App.2d 860, 862–863 [329 P.2d 104], the court attempted to determine the testator's intent in the will that directed the executor to "see that money from the estate be tythed to the amount of twenty-five per cent and given" to three named charities. The cash in the testatrix's estate at the time was $138.98, while the entire estate was worth $21,014.98. (*Id.* at p. 864.) The court concluded "money" meant the sum total value of the estate, and not merely the cash in the testatrix's bank accounts at the time of her death. (*Id.* at pp. 867–868.) The court concluded the will reflected that the testatrix knew what her assets were based on her description of those items in her other bequests. (*Id.* at p. 865.) Further, the use of the terms "money *from* [the] estate" and "tythed," and the use of a residuary clause that left the residue to her grandson, evidenced her desire to include the total value of the estate in determining the amount to provide to the three charities. (*Id.* at pp. 865–866, italics added.)

A more restrictive meaning of the term "money" was applied in *Estate of Boyle* (1934) 2 Cal.App.2d 234, 236 [37 P.2d 841], where the court concluded that a bequest of " ' "[A]ll other money I may die possessed of after all my bills are paid" ' " did not include corporate stock in the testatrix's estate. The court stated, "There is no doubt that the word 'money' when taken in its ordinary and grammatical sense does not include corporate stocks. Thompson on Wills, section 215 says, 'In its usual and ordinary acceptance it means, gold, silver, or paper money used as a circulating medium of exchange, and does not embrace notes, bonds, evidence of debt, or other personal or real estate, and this popular and well understood meaning should be given to the word when used in a will, unless from a consideration of the entire instrument it was intended by the testator to have a broader meaning to

include notes, bonds and other securities.' Also in 18 Ruling Case Law, at page 1270, we find the following: 'Where there is nothing in a will calling for a construction of the word "money" in any other than its popular and legal meaning it will be confined to gold and silver and other circulating medium of the country, whether in the personal possession of the testator or deposited in the bank.' [Citations.]" (*Ibid.*)

Similarly, in *Estate of Verdisson, supra,* 4 Cal.App.4th at page 1131, the court examined a will, which stated, " '1) I leave my properties to Edwin Nowak. [¶] 2) I leave my money to Lawrence Kesselring. [¶] 3) I leave my pets to Mr. Wardaman [Vardanian] and $20,000.00 to take care of them upon my death.' " (Fn. omitted.) In this instance, the court ascertained that "money" did not include the testatrix's interest in an open-ended federally regulated investment company. (*Id.* at p. 1139.)[3]

B

*Other Relevant Canons of Construction of Wills Support the
Trial Court's Ruling*

█ Given the inherent ambiguity of the term "money," we must turn to other rules of construction to assist us in determining what Goyette meant in his will. The fact that he made a will raises the presumption that he intended to dispose of all of his property. (*Estate of O'Connell, supra,* 29 Cal.App.3d at p. 531.) Further, as stated in *Estate of O'Connell,* at pages 531–532, "Once the testamentary scheme or general intention [of a will] is discovered, the meaning of particular words and phrases is to be subordinated to this scheme, plan or dominant purpose . . . ."

Here, we ascertain from the will's face a general scheme to benefit York and Hayward. The will names these two beneficiaries only and singles them out to receive all of Goyette's real property, and his "money." In line with this general scheme, it makes sense that his use of the term "my money" includes all of Goyette's financial assets.

Goyette's will also shows Goyette's lack of legal sophistication. His bequests of his real property do not identify that real property in any technical or legal sense. He bequeathed "the lot across the street from [his] home" and "[his] home and the lots around it." Like the court in *Estate of*

---

[3] We find other cases cited by Harkey discussing what the term "cash" means in a will bequest to be unhelpful here. (See, e.g., *Estate of Chamberlain* (1941) 46 Cal.App.2d 16, 20 [115 P.2d 235] [cash does not include savings bonds]; *Estate of O'Connell* (1972) 29 Cal.App.3d 526 [105 Cal.Rptr. 590] [cash includes a certificate of deposit].) The relevant term in Goyette's will is "my money," not "cash."

*Stadler, supra,* 177 Cal.App.2d at pages 712–713, we conclude this lack of legal sophistication supports the conclusion that Goyette used the term "my money" in its most flexible sense to include all of his financial assets.

■    This interpretation is also consistent with the rule that prefers a construction of a term of a will that avoids complete or partial intestacy. (*Estate of Verdisson, supra,* 4 Cal.App.4th at p. 1137.) It is the strongly favored policy of the law that wills be construed in a manner that avoids intestacy. To this end, Probate Code section 21120 provides, "The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative. Preference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in an intestacy or failure of a transfer."

Here, if we were to construe "my money" to mean only Goyette's bank accounts and not the other financial assets, the treasury bills, money market account, and savings bonds, then almost 50 percent of his estate would pass to the cousins through the law of intestacy. Under the construction placed on the term "my money" by the trial court, less than 1 percent of the estate's assets will pass in that manner. Given the preference for an interpretation that avoids intestacy, we find no error in the court's construction.

Harkey argues the presumption against intestacy does not apply where the testator clearly intended that partial intestacy result, citing *Estate of Verdisson, supra,* 4 Cal.App.4th at page 1137, footnote 4. As explained by *Estate of Beldon* (1938) 11 Cal.2d 108, 112 [77 P.2d 1052], "A court's inquiry in construing a will is limited to ascertaining what the testator meant by the language which was used. If he used language which results in intestacy, and there can be no doubt about the meaning of the language which was used, the court must hold that intestacy was intended. A testator has the right to make a will which does not dispose of all of his property but leaves a residue to pass to his heirs under the law of succession. Such a will is not the usual one but when the language which leads to that result is clear the will must be given effect accordingly." Here, we find nothing in his will that constitutes a clear expression of Goyette's intent that his financial assets pass by intestate succession.

■    Given the ambiguity in the term "my money," the readily apparent scheme in the will to benefit Hayward and York, and the preference against the estate passing through intestacy whenever possible, we conclude the trial

court correctly concluded the term "my money" included all of Goyette's financial assets.[4]

## C

### *The Prior Wills Were Not Properly Before the Trial Court*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. York and Hayward shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Sims, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 12, 2005.

---

[4] Hayward and York do not argue "my money" includes the other items of personal property; therefore, we express no opinion as to whether those assets would also be included in this bequest.

[*] See footnote, *ante*, page 67.