Filed 9/6/22  Gaynor v. Jones CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DOROTHY W. GAYNOR et al., | D078893 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. PN16579) |
| MARILYNN JONES, | |
| Defendant and Respondent; | |
| CITY NATIONAL BANK, as Trustee, etc., | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Witham Mahoney & Abbott, Daniel W. Abbott and Michael A Leone for Plaintiffs and Appellants.

Beamer, Lauth, Steinley & Bond, Stephen A. Bond for Defendant and Respondent.

No appearance for Respondent. Real Party in Interest, Albence & Associates, David Scott Pawlowski.

Plaintiffs and appellants Dorothy W. Gaynor,[1] Michelle E. Gaynor, Michael D. Gaynor, and Max Gaynor (collectively, appellants), appeal an order denying their first amended petition for an order construing the terms of a trust and instructing the trustee regarding allocation of the trust income. The trust provided that upon the trustor's death, the trust estate would be divided into three equal shares, one for each of the trustor's three children. The trust further instructed how those shares would be subdivided into subshares among the issue of each of the three children. The dispute in this case concerns what happens with a subshare belonging to one of the trustor's children's issue (the trustor's grandchild or great-grandchild, etc.) who dies without issue of their own. Appellants contend that the subshare should be subdivided, by right of representation, among the issue of the trustor's child from whom the deceased beneficiary descended such that the deceased beneficiary's subshare would remain in the family branch of that trustor's child, thus maintaining an equal one-third division of the trust estate within that branch of the family. Defendant and respondent Marilynn Jones, one of Edwin's grandchildren belonging to the most populous family branch, contends that the deceased beneficiary's subshare should be subdivided among the trustor's three children, by right of representation, i.e., it would be distributed among the trustor's three children's family branches, thus altering the equal one-third division of the trust estate among the three branches.

---

[1]     Because this matter involves many family members with the same last name, we refer to them initially by their first and last names, and thereafter by first names only.

Based on the language of the trust, we agree with respondent. We therefore affirm the trial court's order denying appellants' petition.

FACTUAL AND PROCEDURAL BACKGROUND

A. Relevant Versions of the Trust

1. Original Trust

The trust at issue is the Bulen Trust, created by the trustor Edwin Bulen in 1968. The original version of the trust provided that upon Edwin's death, after annual payments to his wife, the trustee shall pay the net income of the trust estate "to the children of the Trustor or to their issue upon the principle of representation, until the Trust Estate is distributed as set forth below." The trust then provided that upon the later of the death of Edwin's last surviving child or the death or remarriage of Edwin's wife, "the Trustee shall distribute the Trust Estate in equal shares to the grandchildren of the Trustor, then living." The trust would terminate 21 years after the death of Edwin's last child or grandchild who was living at the time of Edwin's death, at which time "[a]ll principal and undistributed income of any trust so terminated shall be distributed to the then living grandchildren of the Trustor as set forth herein."

2. Second Amendment

The second amendment of the trust was a complete restatement. The second amendment provided that upon Edwin's death, after paying Edwin's debts, expenses and taxes arising from his death, a fixed amount to a school district, and annual payments to Edwin's wife, the trust was to be distributed as follows:

> "2.6 The Trustee shall thereupon divide the remaining trust estate into as many equal shares as will allow the Trustee to set apart one such share for each then living child of the Trustor and one such share for the collective then living issue of each such child of the Trustor who shall

3

have previously died.  Each share set apart for the collective living issue of a previously deceased child of the Trustor shall be further divided and set apart into subshares for such deceased child's issue, by right of representation."

The trust provision at issue is paragraph 2.7 of the second amendment, which remained unchanged through subsequent amendments:

"2.7  In addition, unless the death of one of the persons designated in Paragraph 2.6 or in this Paragraph 2.7 is the terminating event for all trusts established by this Declaration of Trust, the Trustee shall, upon the death of each of said persons and upon the subsequent deaths of each of their issue (for whose benefit subshares are hereby set apart), subdivide and further subdivide said shares and subshares into as many subshares as will allow the Trustee upon the death of each of such persons and each of their issue to set apart the same into subshares for the benefit of his or her then living issue, by right of representation, or in default of issue into subshares for the benefit of the Trustor's then living issue, by right of representation."

Paragraph 2.10 of the second amendment provided that the trust would terminate on the 21st anniversary of the death of the final survivor of Edwin, Edwin's wife, Edwin's children, and Edwin's issue living at the time of Edwin's death.  At termination, "the principal of the trusts shall be distributed to the persons then entitled to the income therefrom, if then living, or if any such person is then deceased to his or her issue, by right of representation, or in default of issue, to the Trustor's then living issue, by right of representation, or in default of then living issue of the Trustor to said School District to be added to said Fund."

The second amendment defined the term "issue" to refer to "lineal descendants of all degrees of consanguinity of the person or persons to whom

4

reference is made, and shall include adopted persons, provided they are legally adopted before attaining the age of ten years."

### 3. Third and Fourth Amendments

The third amendment changed the successor trustee from Edwin's three children William H. Bulen, James A. Bulen, and Mary C. Wilmot, to his three children as well as his wife and his attorney John Wilson Brown (Mr. Brown).

The fourth amendment established that the successor trustees would be Edwin's son William, then Edwin's accountant, then San Diego Trust & Savings Bank.

### 4. Fifth Amendment

The fifth amendment changed paragraph 2.6 to read as follows:

> "2.6 Subject to the provisions of 2.4[2] hereinabove, the Trustee shall thereupon divide the remaining trust estate, or all thereof if the Trustor's wife fails to survive him, into as many equal shares as will allow the Trustee to set apart one such share for each then living child of the Trustor and one such share for the collective then living issue of each such child of the Trustor who shall have previously died. Each share set apart for the collective living issue of a previously deceased child of the Trustor shall be further divided and set apart into subshares for such deceased child's issue, by right of representation."

### 5. Sixth Amendment

The sixth and final amendment established that Edwin would be the trustee, but his son William would be special trustee with respect to the trust's interest in the Escondido Village Mall. Upon Edwin's inability to serve as trustee, William would also cease to act as special trustee. The

---

[2] Paragraph 2.4 referred to paying Edwin's debts, and expenses and taxes arising from his death.

5

successor trustees would be Edwin's son William, then Edwin's accountant, then San Diego Trust & Savings Bank.

## B. The Family Tree

At the time Edwin restated the trust by the second amendment in 1975, Edwin's three children were still living. William had two children and one grandchild; James had five children and two grandchildren; and Mary had three children and no grandchildren.

At the time Edwin executed the sixth and final amendment in 1976, only James's family had increased in size; James had seven children and seven grandchildren.

As far as we are able to ascertain from the record on appeal, the current makeup of the family, not reflecting those individuals who are deceased, is as follows:

(1)  William has two children, Richard K. Bulen and Neal B. Bulen. Richard has one son, Christopher Bulen. Neal has no children.

(2)  James has seven children, Ann E. DeChairo-Marino, James Steven Bulen (James S.), Phillip William Bulen, James Arthur Bulen, Jr. (James Jr.), Jessica Noelle Bulen, E.H. Bulen, and respondent Marilynn Jones. James has seven grandchildren.[3]

(3)  Mary has three children, Dorothy, James Wilmot (James W.), and Catherine Wilmot. Dorothy has three children, Michelle, Max, and Michael. Neither James W. nor Catherine has children.

## C. Previous Distributions of Shares and Subshares

Edwin died in 1983, at which time the trust became irrevocable. Each of Edwin's three children was alive at the time of Edwin's death and each was

---

[3]    It is unclear which of James children have children. This information is not relevant or necessary for our analysis.

6

entitled to an equal one-third share of the trust estate pursuant to paragraph 2.6. However, both William and James disclaimed their interests in the trust and their shares passed to their children.

Pursuant to paragraph 2.6, James's share was subdivided into subshares for each of his living issue, by right of representation. Thus, Ann, James S., Phillip, James Jr., Jessica, E.H., and Marilynn each received equal one-seventh subshares of James's one-third share of the trust estate.

William's share was subdivided into subshares for each of his living issue, by right of representation. Thus, Richard and Neil each received equal one-half subshares of William's one-third share of the trust estate.

Mary received her one-third share of the trust estate.

Richard died in 1997, at which time his only living issue, Christopher, received Richard's subshare.

William's son Neal died in 1998, with no issue. The dispute in this case concerns the proper distribution of Neal's subshare. To resolve the dispute, we must interpret paragraph 2.7 of the trust, as applied to the circumstance where a beneficiary dies without issue. Neal's subshare was ultimately subdivided among Edwin's then living issue, by right of representation—i.e. to Edwin's three children's family branches. Thus, Mary received one-third of Neal's subshare, each of James's children received an equal one-seventh share of one-third of Neal's subshare, and William's only living issue, Christopher, received one-third of Neal's subshare.

Mary died in 2013, at which time her share was subdivided into equal subshares for each of her children, James W., Catherine, and Dorothy.

D. Trial Court Proceedings

Appellants filed a petition on December 2, 2019, seeking an order construing the trust terms pertaining to the allocation of subshares upon the

7

death of a beneficiary without living issue. Appellants filed a second amended petition on July 24, 2020, seeking an order (1) construing the trust terms for allocation of subshares upon the death of a beneficiary without living issue, and (2) instructing the trustee regarding allocation of income.

Appellants alleged that paragraph 2.7 should be construed as providing that when a beneficiary dies without living issue, that beneficiary's subshare is to be subdivided, by right of representation, among the remaining issue of Edwin's child from whom the deceased beneficiary descended. For example, Mary's child James W. has no children. If James W. were to die with no children, appellants alleged that his subshare should be subdivided only among Mary's living issue, by right of representation. Thus, Catherine and Dorothy would both receive an equal one-half of James's subshare. If, on the other hand, a beneficiary were to die with living issue, that beneficiary's subshare would be subdivided among the deceased beneficiary's living issue, by right of representation. For example, when Dorothy dies, her subshare would be subdivided into equal one-third subshares for Michelle, Max, and Michael.

Respondent agreed that when a beneficiary dies with issue, that beneficiary's subshare is to be subdivided into subshares for that beneficiary's living issue, by right of representation. However, she disagreed as to how a beneficiary's subshare is to be distributed if the beneficiary dies without living issue. Respondent maintained that when a beneficiary dies without issue, that beneficiary's subshare is to be subdivided among all of Edwin's living issue, by right of representation. For example, when Neal died, his subshare was subdivided into three subshares that were allocated to Edwin's living issue, by right of representation: (1) one to Mary; (2) one among

8

James's seven children; and (3) one to Christopher, who was William's only living issue.

Appellants contended that paragraph 2.7 of the trust required that the subshare of a deceased beneficiary revert to all of Edwin's living issue, by right of representation, *only if* the deceased beneficiary were the last living issue of Edwin's child from whom the deceased beneficiary descended. For example, Christopher has no issue and is the last remaining living issue of William. If Christopher were to die without issue, his subshare would be subdivided among Edwin's living issue, by right of representation.

Focusing on paragraph 2.6, appellants contended that the "dominant purpose" of the trust was to divide the trust estate into equal shares set apart for each of Edwin's three children, to ensure equality among the three family branches regardless of the disparity as to the number of issue within each child's family branch. Appellants further argued that this dominant purpose must be given effect as long as a family branch exists. According to appellants, respondent's interpretation of the trust would dispense with the equal share structure, in violation of the dominant purpose of the trust. To support their position, appellants submitted a letter that William wrote to James in December 2001 purporting to explain Edwin's intent to create equal shares set apart for each of Edwin's three children. In his letter, William stated "[e]vidently you do not remember the way our dad set up his trust. He originally set it up so the grandchildren inherited equally. I pointed out that each family should inherit equally and he changed it." Appellants emphasized that Edwin and William had a particularly close relationship, as shown by the trust amendments appointing William as the trustee.

Respondent argued that the terms of the trust had previously been examined and applied in accordance with respondent's interpretation of the

9

disputed provision. When Richard died, his subshare was distributed to his issue, Christopher. When Neal died without issue, his subshare was subdivided and distributed to all of Edwin's living issue, by right of representation, and not solely to the living issue of William. Respondent argued that the language of paragraph 2.7 requires that when a beneficiary dies without issue, that beneficiary's subshare must be distributed, by right of representation, among all of Edwin's living issue. Respondent acknowledged that the second amendment required "an *initial* allocation in equal shares among the three families of the children of [Edwin]," but argued that "there is no sound basis in law or fact for extrapolating from that *initial* division of the Trust estate a 'dominant' purpose to hold those equal shares for so long as there are descendants of a child in existence." According to respondent, the second amendment "does not *retain* equal shares among the three families over time."

Respondent contended that the plain meaning of the words in paragraph 2.7 are not sufficiently ambiguous to support resorting to extrinsic evidence to explain the trustor's intent. Nonetheless, respondent argued that a February 4, 1997 letter written by Edwin's attorney, Mr. Brown, who drafted the trust instruments, was more persuasive than William's letter, with respect to Edwin's intent. In his letter to the trustees, the Mr. Brown wrote:

> "Under paragraph 2.7 of the Second Amendment, upon the death of any one of the initial trust beneficiaries, the Trustee is directed to subdivide his or her trust into subshares for the benefit of that deceased's [sic] initial beneficiary's issue, by right of representation, or if that beneficiary leaves no issue, then it is to be set apart instead for the benefit of Edwin S. Bulen's then living issue, by right of representation."

10

In a subsequent letter dated July 18, 1997, following the death of Richard, Mr. Brown referred to his February 4, 1997 letter stating:

> "The succession of interests of beneficiaries upon their death is covered on page 4 of that letter by way of reference to paragraph 2.7 of the Second Amendment. As to current trust beneficiaries who leave no issue, the shares are reallocated among Ed Bulen's then living issue, by right of representation."

Respondent argued that Mr. Brown was best acquainted with Edwin's intent because he prepared the trust instruments, maintained a client relationship with Edwin for nine years after execution of the second amendment, and counseled the trustees as to the administration of the trust for 21 years after Edwin's death.

Respondent also argued that appellants' proposed redistribution of Neal's share to William's family branch, rather than among Edwin's issue by right of representation, which is what was done when Neal died in 1998, is an action to remedy an alleged breach of the terms of the trust, and is barred by the three-year statute of limitations under Probate Code section 16460.

The trial court denied appellants' petition, disagreeing with their contention that the dominant purpose of the trust was to create three equal shares for Edwin's three children's families. Instead, the court concluded that dominant purpose of the trust appeared to be that the trust go on for as long as possible. The court did not believe that Edwin intended to effectively create three trusts going forward and did not read the trust as setting forth appellants' proposed dominant purpose "in any clear manner." Looking to the text of paragraph 2.7, the court extrapolated the question of what happens to a beneficiary's share when they die and found that the trust instructs that if a beneficiary dies without issue, his or her share is to be subdivided among Edwin's then living issue. The court considered all

11

extrinsic evidence and ordered that "each piece of evidence offered is given it's appropriate weight," but did not specify whether, or how, any item of evidence had impacted the court's ruling.

## DISCUSSION

Appellants argue that Edwin's intent was for equal shares of the trust estate to be set apart for each of his three children's family branches until such time as a child no longer has living issue within his or her branch. Specifically, appellants contend that the language in paragraph 2.6 shows that the trust's "dominant purpose" was to divide Edwin's estate equally among his three children and to maintain this equal division for as long as each family branch exists. Appellants further contend that paragraph 2.7, which establishes the procedure for redistribution of shares and subshares, must be interpreted in a manner that maintains the three separate, equal shares as established in paragraph 2.6.

Respondent contends that when a beneficiary dies without issue, that deceased beneficiary's subshare is to be distributed among all of Edwin's living issue, by right of representation, which would alter the equal shares initially set apart for Edwin's three children's family branches. Respondent also argues that appellants' petition is barred by the statute of limitations.

Based on the language of the trust, we agree with respondent's interpretation. We therefore affirm the trial court's order denying appellants' first amended petition seeking to enforce their interpretation of the trust. Because we affirm the trial court's order denying appellants' first amended petition on the merits, we need not reach respondent's statute of limitations arguments.

12

## A. Applicable Law

In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker.  (*In re Estate of Gump* (1940) 16 Cal.2d 535, 548 (*Gump*).)  "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."  (Prob. Code, § 21102, subd. (a).)  "The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative. . . ."  (Prob. Code, § 21120.)  "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole.  If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument."  (Prob. Code, § 21121.)  "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained."  (Prob. Code, § 21122.)

"If the language of the instrument clearly sets forth the intent, the court does not consider extrinsic evidence; it only looks to extrinsic evidence in the event of an ambiguity."  (*Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949.)  "The court can also consider extrinsic evidence regarding the circumstances under which the trust was made, in order to interpret the trust instrument, but not to give it a meaning to which it is not reasonably susceptible.  [Citation.]  However, if the court can ascertain the testator's intent from the words actually used in the instrument, the inquiry ends."  (*Ibid.*)

"The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch v. George* (1994) 7 Cal.4th 246, 254.) Because our resolution of this matter does not turn on a conflict in or credibility of extrinsic evidence, we apply the de novo standard of review.

## B. Analysis

The language of the trust is unambiguous and clearly sets forth the Edwin's intent. There is thus no need to resort to extrinsic evidence in interpreting the trust. We therefore do not address the parties' arguments regarding William's December 2001 letter, offered by appellants, or Mr. Brown's February 4, 1997 and July 18, 1007 letters, offered by respondent.

Appellants urge that the dominant purpose of the trust as expressed in paragraph 2.6 "was to divide Edwin's estate equally between the three (3) family branches represented by each of his children, until such time as one of his children's family branches ceased to exist for want of issue." Appellants contend that this dominant purpose is demonstrated by Edwin's restatement in the second amendment, which provided that upon his death, the trust assets were to be distributed in equal shares to his three children. Appellants note that, at the time of the second amendment, there was a substantial disparity as to the number of issue within each child's family branch. Appellants argue that Edwin was aware that this would result in his children's issue receiving unequal subshares, but he nonetheless chose to provide for the division of his estate into thirds—one third for each of his three children's family branches.

Quoting *Estate of Goyette* (2004) 123 Cal.App.4th 67, 73 (*Goyette*), appellants argue that " ' "[o]nce the testamentary scheme or general intention [of a trust] instrument is discovered, the meaning of particular words and

14

phrases is to be subordinated to this scheme, plan or dominant purpose." ' " In *Goyette*, the court was called upon to interpret the testator's intent with respect to the meaning of the term "my money." (*Id.* at p. 68.) The appellant argued that "money" as used in the will included only cash and bank accounts, but did not include investments. (*Id.* at p. 71.) The Court of Appeal disagreed. (*Ibid.*) In reaching this conclusion, the court began by noting that the term "money," standing alone, is ambiguous. (*Ibid.*) "Given the inherent ambiguity of the term 'money,' " the court turned to other rules of interpretation, including the principle on which appellants in this case rely— that the meaning of particular words and phrases is to be subordinated to the scheme, plan, or dominant purpose of the trust. (*Id.* at p. 73.)

The court in *Goyette* ascertained from the face of the will a general scheme to benefit two beneficiaries because the will named those two beneficiaries only and singled them out to receive all of the testator's real property and "money." (*Goyette*, *supra*, 123 Cal.App.4th at p. 73.) The court concluded that, in line with this general scheme, it made sense that the testator's use of the term "my money" included all of his financial assets, including cash and bank accounts, as well as treasury bills, a money market account, and savings bonds. (*Id.* at p. 73.) The court reasoned that if "my money" were limited to the testator's cash and bank accounts, then almost half of his estate would pass through intestacy, which is contrary to the strongly favored policy that wills be construed in a manner that avoids intestacy. (*Id.* at p. 74.) "Given the ambiguity in the term 'my money,' the readily apparent scheme in the will to benefit [the only two beneficiaries named in the will], and the preference against estate passing through intestacy whenever possible," the court concluded that the term "my money" included all of the testator's assets. (*Id.* at pp. 74-75.)

15

We decline to subordinate the words of the trust to appellants' proposed dominant purpose, for a number of reasons. First, unlike in *Goyette*, appellants have not identified any term in the trust, or in paragraph 2.7 in particular, that is ambiguous. While paragraph 2.7 could be clearer, we find no ambiguity in the terms of the trust. Second, there is nothing in the trust that constitutes a clear expression of an intent on Edwin's part that each of his three children's family branches maintain equal shares of his estate until one of his children has no remaining issue within his or her family branch. We will not interpret the terms of the trust in a manner to enforce a purported intent or "dominant purpose" that is not ascertainable from the face of the trust. (*Gump*, *supra*, 16 Cal.2d at p. 548 [the first step in construing a trust instrument is to ascertain the trustor's intent].) While we agree that paragraph 2.6 clearly establishes Edwin's intent that upon his death, his estate be divided into equal shares for his three children or, if a child were deceased, the collective living issue of that child, there is no clear expression in the trust—in paragraph 2.6 or elsewhere—that Edwin intended to preserve this equal division until such time as a family branch ceased to exist.

This conclusion is substantiated by the fact that the only interpretation that would preserve the equal division for as long as each family branch exists, would also result an outcome much less likely to have been intended by Edwin. Specifically, pursuant to the language of paragraph 2.7, as we will explain, if we were to interpret the trust such that when a beneficiary dies with no issue, his or her subshare is subdivided only among the issue of Edwin's child from whom the deceased beneficiary descended, thereby keeping that subshare within that family branch and maintaining the equal division among Edwin's three children, that would also mean that when a

16

beneficiary dies *with his or her own issue*, his or her subshare would similarly be subdivided to all of the issue of Edwin's child from whom the deceased beneficiary descended, rather than among only the deceased beneficiary's own issue.

Paragraph 2.7 provides:

> "In addition, unless the death of one of the persons designated in Paragraph 2.6 or in this Paragraph 2.7 is the terminating event for all trusts established by this Declaration of Trust, the Trustee shall, upon the death of each of said persons and upon the subsequent deaths of each of their issue (for whose benefit subshares are hereby set apart), subdivide and further subdivide said shares and subshares into as many subshares as will allow the Trustee upon the death of each of such persons and each of their issue to set apart the same into subshares *for the benefit of his or her then **living issue, by right of representation**, or in default of issue into subshares for the benefit of the Trustor's then **living issue, by right of representation**.*" (Italics and bold added.)

"Issue," as defined in the second amendment, refers to "lineal descendants of all degrees of consanguinity of the person or persons to whom reference is made, and shall include adopted persons, provided they are legally adopted before attaining the age of ten years."

When a trust calls for property to be distributed "by right of representation," Probate Code section 246 provides that the property "shall be divided into as many equal shares as there are living children of the designated ancestor, if any, and deceased children who leave issue then living. Each living child of the designated ancestor is allocated one share, and the share of each deceased child who leaves issue then living is divided in the same manner."

17

The two references in paragraph 2.7 to distribution to "living issue, by right of representation" contemplates two different scenarios: (1) setting apart subshares for the benefit of *his or her* then living issue, by right of representation (when "his or her then living issue" exist); and (2) in default of issue, setting apart subshares for the benefit of *the Trustor's* then living issue, by right of representation (when there is no "his or her then living issue" in existence). Thus, the two scenarios implicate two "designated ancestors" whose shares will be distributed by right of representation.

Appellants argue that the second reference in paragraph 2.7 to distribution to "living issue, by right of representation" (the second scenario) identifies "the Trustor"—i.e., Edwin—as the designated ancestor. We agree. The second scenario instructs that a subshare shall be set apart for the benefit of "*the Trustor's* then living issue, by right of representation." (Italics added.) Appellants contend that this scenario is triggered only if the designated ancestor implicated by the first reference to distribution to "living issue, by right of representation," dies without living issue. Again, we agree. The second scenario is triggered "in *default of issue*," referring to the designated ancestor implicated in the first reference to "living issue, by right of representation." (Italics added.) Thus, when determining what triggers the second scenario, i.e., when a deceased beneficiary's subshare will be distributed among all of Edwin's issue, the question is to whom "his or her" refers.

Appellants argue that the designated ancestor in the first reference to distribution to "living issue, by right of representation," (the first scenario) is each of Edwin's three children. That is, "his or her" must refer to Edwin's three children. We disagree and instead conclude that "his or her" refers to whomever died. We explain our reasoning by first demonstrating the flaw in

18

appellants' proposed interpretation. We then demonstrate that the language of the trust supports our interpretation.

If the designated ancestor for purpose of the first reference to distribution to "living issue, by right of representation," is each of Edwin's children, appellants would obtain the result they seek. In the second scenario, if a beneficiary were to die with no living issue, and Edwin's child from whom the deceased beneficiary descended (assuming that is the designated ancestor in the first reference to distribution to "his or her then living issue, by right of representation,") has no living issue, then the deceased beneficiary's share will be distributed among all of Edwin's then living issue, by right of representation. For example, if Christopher were to die, William would have no remaining living issue, and Christopher's subshare would be distributed among Edwin's then living issue, by right of representation: (1) One-half among James's seven children; and (2) One-half among Mary's three children, Catherine, James, and Dorothy.

In the first scenario, if a beneficiary were to die with no issue, but Edwin's child from whom the deceased beneficiary descended (assuming, as appellants posit, that is the designated ancestor in the first reference to distribution to "his or her then living issue, by right of representation") has living issue, then the deceased beneficiary's share would be subdivided among that child's then living issue, by right of representation. For example, if Catherine were to die, her subshare would be subdivided between Mary's then living issue by right of representation: (1) One-half to James; and (2) One-half to Dorothy.

Thus, a deceased beneficiary's share would be distributed among Edwin's then living issue, by right of representation (i.e., the second scenario would be triggered) *only if* Edwin's child from whom the deceased beneficiary

19

descended (again, assuming that is the designated ancestor in the first reference to distribution to "living issue, by right of representation") has no living issue. In other words, so long as Edwin's child from whom a deceased beneficiary descended has living issue, the deceased beneficiary's subshare would remain in that child's family branch.

The flaw in interpretating paragraph 2.7 such that the designated ancestor implicated by the first reference to distribution to "living issue, by right of representation," is each of Edwin's three children is shown by considering what would happen if a beneficiary were to die *with issue of their own*. If "his or her then living issue" refers to each of Edwin's children's then living issue, that would mean that when a grandchild (or great-grandchild, etc.) dies, his/her subshare would be subdivided among *all* living issue of Edwin's child from whom the deceased grandchild descended, *regardless of whether the deceased grandchild has issue of his/her own*. For example, if Dorothy were to die, her subshare would *not* be subdivided into thirds for the benefit of each of Dorothy's own issue, Michelle, Michael, and Max. Instead, it would be subdivided among *Mary's* (Dorothy's mother's) then living issue, by right of representation: (1) One-third to Catherine; (2) One-third to James; and (3) One-third among Michelle, Michael, and Max. As another example, if we were to interpret "his or her then living issue" to refer to each of Edwin's children's then living issue, that would mean that when Richard died in 1997, his subshare should not have been distributed to Christopher, but instead, one-half to William's son Neal and one-half to Richard's son Christopher. We cannot conclude that Edwin intended this outcome.

The more reasonable outcome occurs when paragraph 2.7 is interpreted such that the designated ancestor in the first reference to distribution to "living issue, by right of representation," is the person who died. In other

words, "his or her" refers to the person who died. Thus, in the first scenario, if a beneficiary were to die with living issue, distribution of the deceased beneficiary's subshare to "his or her then living issue, by right of representation," would result in distribution to the deceased beneficiary's then living issue, by right of representation. For example, if Dorothy were to die, her subshare would be subdivided into thirds for the benefit of her own issue: Michelle, Michael, and Max. That is what occurred when Richard died: his subshare was distributed to "his or her then living issue," Christopher. If the deceased beneficiary has no living issue (i.e., "or in default of issue"), then the second scenario is triggered, requiring distribution of the deceased beneficiary's subshare among all of Edwin's then living issue, by right of representation.

Appellants contend that Edwin did not "authorize a reallocation of his Estate that eliminated the three (3) equal share structure that Paragraph 2.6 established." Paragraph 2.7, however, does just that—when a beneficiary dies without issue. In addition to the fact that this interpretation results in a more likely intended outcome, as discussed above, the language of the trust supports this interpretation.

Paragraph 2.7 instructs the trustee, "*upon the death of each said persons and upon the subsequent deaths of each of their issue* (for whose benefit subshares are hereby set apart), [to] subdivide and further subdivide said shares and subshares into as many subshares as will allow the Trustee upon the death of each of *such persons and each of their issue* to set apart the same into subshares for the benefit of his or her then living issue, by right of representation, or in the default of issue into subshares for the benefit of the Trustor's then living issue, by right of representation." (Italics added.)

21

"His or her" cannot refer to Edwin's three children because paragraph 2.7 addresses the death of "such persons *and each of their issue*," with "such persons" referring to "persons designated in Paragraph 2.6 or in this Paragraph 2.7." Thus, paragraph 2.7 addresses the death of one of Edwin's children (or if a child predeceased Edwin, that child's children) *and each of their issue* (i.e., Edwin's grandchildren, and great-grandchildren, etc.). And when a grandchild (or great-grandchild, etc.) dies, paragraph 2.7 directs that his or her subshare be subdivided to "his or her then living issue, by right of representation" or if the grandchild has no living issue, to Edwin's living issue, by right of representation. This interpretation of the trust gives effect to every expression rather than rendering any expression inoperative, while preserving and implementing Edwin's intent as clearly expressed in the trust.

While our interpretation does alter the three equal share structure when an beneficiary dies without issue, contrary to appellants' contention, it does not do so via the "changing fraction method" that the appellant sought to implement in *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058 (*Ammerman*). This case and the trust at issue is distinguishable from *Ammerman*.

The issue in *Ammerman* was how the residue of a trust was to be divided. The trust provided that upon the trustor's death, the trust's residuary estate would be divided, one-third each, to subtrusts for three beneficiaries, Cathe, Katy, and Lucky. (*Ammerman*, *supra*, 245 Cal.App.4th at p. 1062.) The trust also provided that upon the trustor's death, the estate taxes were to be charged to Cathe's and Lucky's trusts only, not Katy's. (*Id.* at p. 1064.) The trial court ruled that the residuary estate should be divided based on a "changing fraction method" where "all 'non[-]pro[-]rata charges

against principal result in changes to the fractional interests of the residuary beneficiaries, with later income, principal receipts and gain (or loss), whether realized or unrealized, accruing to the residuary beneficiaries pro rata based on the new fractional interests.'" (*Id.* at pp. 1068-1069.) Thus, when the estate tax payments were made by Cathe and Lucky only, the three beneficiaries' fractional interests were to be revalued and changed from the original one-third allocation to each beneficiary, resulting in the reduction of Cathe's and Lucky's percentage interests in the trust's residuary and simultaneously increasing Katy's percentage interest. (*Id.* at pp. 1062-1063.)

The Court of Appeal disagreed, concluding that the beneficiaries' percentage interests in the residuary estate did not change when the estate taxes were paid by Cathe and Lucky. (*Ammerman*, *supra*, 245 Cal.App.4th at pp. 1062-1063.) The court reasoned "[t]he Trust plainly stated that [the trustor] wanted the residue divided one-third each among the Beneficiaries. Although the estate taxes were allocated to Cathe and Lucky, the Trust did not provide this allocation would alter the one-third division or the vested interests of the Beneficiaries in their one-third shares of the residuary estate." (*Id.* at p. 1074.) In other words, the fact that the amount of principal in Cathe's and Lucky's subtrusts was less than Katy's after payment of the estate taxes, did not mean that Cathe's and Lucky's vested interests in the trust's residuary were less. The court emphasized, "[t]here is no language in the Trust stating that when taxes were charged to Cathe and Lucky or non-pro-rata distributions were made, the fractional shares of the Beneficiaries were to change." (*Id.* at p. 1088.)

Unlike in *Ammerman*, the language in paragraph 2.7 of the trust at issue does direct an alteration of the three equal share structure when a beneficiary dies without issue, as discussed above. Also as discussed above,

23

we see nothing in the trust that constitutes a clear expression of an intent on Edwin's part, or a "dominant purpose," that the trust be administered to avoid altering the initial three equal share structure.

Based on the unambiguous language of the trust, we affirm the trial court's order denying appellants' first amended petition seeking to enforce their interpretation of the trust.

Because we affirm the trial court's order denying appellants' first amended petition on the merits, we need not reach respondent's statute of limitations arguments.

DISPOSITION

The trial court's order is affirmed. Respondent is to recover costs on appeal.

AARON, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.